IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ARTHUR COLEMAN,<br><br>    Petitioner,<br><br>v.<br><br>CHRISTOPHER SMITH, and BRIAN E. FROSH,<br><br>    Respondents. | Civil Action No.: BAH-22-646 |

**MEMORANDUM OPINION**

Self-represented Petitioner, Arthur Coleman, filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in which he challenges the validity of his convictions and sentence in the Circuit Court for Howard County, Maryland, for human trafficking offenses. ECF 1. The Petition is fully briefed. ECFs 1, 7, 10. Upon review of the submitted materials, the Court finds that no hearing is necessary. Loc. R. 105.6 (D. Md. 2023); Rules 1(b) and 8(a), *Rules Governing Section 2254 Cases in the United States District Courts*. For the reasons set forth below, the Petition is **DENIED**.

I.    **BACKGROUND**

    A.  **Convictions and Sentence**

On January 27, 2017, a jury in the Circuit Court for Howard County found Coleman guilty of two counts of transporting a minor for the purpose of prostitution; two counts of attempted transport of a minor for the purpose of prostitution; one count of receiving consideration to place a minor in a place with the intent of causing the minor to prostitute; one count of benefitting financially from taking a minor to a hotel for prostitution; and one count of persuading a minor to leave her home or the custody of her parent or guardian for the purpose of prostitution. ECF 8-4,

at 13-17; ECF 7-1, at 130.  The following relevant facts, as described by the Appellate Court of

Maryland (the "Appellate Court"),[1] were adduced during pretrial and trial proceedings:

> [I]n July of 2016, Howard County Police Detective Kalle James-Wintjen of the Vice and Narcotics Unit, became aware that A.M., a thirteen-year-old female, who had been in the custody of the Howard County Department of Social Services, and had run away, was engaged in prostitution. Detective James-Wintjen searched various social media websites in an attempt to locate A.M., and eventually located a profile that the Detective believed belonged to A.M. on the social media website named, Tagged,[1] as well as postings related to her on Backpage.com.[2] On July 21, 2017, the Detective, working in an undercover capacity and posing as a young female, used a false Tagged account to contact A.M., claiming that she, like A.M., was also interested in prostitution.
>
> The Detective agreed on July 22, 2017 to meet A.M. that night and join her in going to a "party" in Elkridge to engage in prostitution. A.M. arrived at the agreed-upon location in a car driven by Coleman. B.T., a sixteen-year-old female, who was also the subject of a missing child investigation, was also inside the car. Coleman was arrested, and his car searched. Police recovered his phone from the car and took possession of A.M.'s phone from her. Coleman's phone contained a contact list that identified certain contacts as "clients," and others as "workers." Coleman's contact information for A.M. identified her as "Worker [A.M.]" and included her photograph.
>
> Evidence adduced at trial also showed that Coleman had sent A.M. text messages between July 14, 2016 and July 22, 2016, identifying himself as "the dude that throw[s] parties," asking A.M. if she was "available for [a] party," did she "want to make some money," and would she be willing to participate in a "freak party," which he told her was not for "shy girls" because, as he explained, it was a party in which everyone has sex in one room at the same time. Additional text messages from the same time period revealed that Coleman had promised A.M. that he would "spoil" her, pay for her to have her hair done, give her "all the big moves" to make lots of money, and that he wanted her to be his "little partner" in their prostitution venture.
>
> On July 22, 2016, Coleman also texted A.M. that he was hosting a party that night, according to evidence adduced at trial. He instructed A.M. to bring other "girls"

---

[1]   At the November 8, 2022, general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland and the Court of Special Appeals was renamed the Appellate Court of Maryland.  The name change took effect on December 14, 2022.  This was a change in name only and does not affect the precedential value of the opinions of the two courts issued before the effective date of the name change.

with her to the party and told her that he would pick them up and bring them to the party that night.

The State also introduced into evidence two ads posted on Backpage.com dated July 22, 2016 that had been associated with an e-mail address that was identified with Coleman's cell phone. The postings, titled "Saturday Night Adult Freak Party, Tattoo Party," included A.M.'s photograph, and advertised a party of fifteen girls with a $30.00 entry fee. In his statement to police, which was introduced at trial, Coleman further acknowledged that on July 22, 2016, he had picked up A.M. from Baltimore to take her to a party, but he denied that he knew the location of the party or that he was hosting the party

> 1 Detective James-Wintjen described "Tagged" as a social media application, similar to Facebook, which allows users to post photographs and comments to their profiles. According to the Detective, the most popular function of the Tagged application is the "chat" function which, she testified, allows users to communicate directly, oftentimes about drugs or sex.
>
> 2 Detective James-Wintjen described "Backpage.com" as a "forum style" website, similar to Craigslist, which contains a small section advertising items for sale, such as furniture or cars, and job postings. The majority of Backpage.com postings, she testified, are ads for prostitution in the form of "adult escort" services and "adult entertainment."

ECF 7-1, at 131–133.

On May 5, 2017, the Circuit Court sentenced Coleman to an aggregate fifty years' imprisonment. *Id.* at 7–10.

### B. Direct Appeal

Coleman filed a direct appeal to the Appellate Court, in which he asserted two errors: (1) there was insufficient evidence to sustain [Coleman's] conviction for Count 8, persuading a minor from her home to engage in prostitution on July 22, 2016, and (2) assuming there was sufficient evidence to sustain [Coleman's] conviction for Count 8, it was not appropriate to impose a separate sentence for that offense. ECF 7-1, at 27. On April 26, 2018, the Appellate Court affirmed the

3

convictions and sentence. *Id.* at 129–49. The Supreme Court of Maryland subsequently denied Coleman's petition for a writ of certiorari as untimely filed. *Id.* at 171,178.

### C. State Post-Conviction Proceedings

On August 14, 2018, Coleman filed a self-represented petition for post-conviction relief in the Circuit Court for Howard County pursuant to the Maryland Uniform Post-Conviction Procedure Act, Md. Code Ann., Crim. Proc. ("CP") §§ 7-101 to 7-204. *Id.* at 154–157. Coleman's appointed counsel later amended his petition. *Id.* at 179–188. Coleman claimed, *inter alia*, that his trial counsel was ineffective for failing to protect his confrontation rights by not calling A.M. and B.T. as witnesses at trial, and prosecutorial misconduct for concealing the whereabouts of A.M. and B.T from the defense. *Id.* at 155. The post-conviction court held a hearing on September 17, 2020, (ECF 8-6) and issued an opinion on December 3, 2020, which denied all of Coleman's claims. ECF 7-1, at 189–209.

On January 4, 2021, Coleman filed an application for leave to appeal the denial of his post-conviction petition. *Id.* at 210–16. The Appellate Court summarily denied Coleman's application. *Id.* at 217–82. When the Appellate Court summarily denies a post-conviction petitioner's application for leave to appeal, no further appeal may be pursued in the Supreme Court of Maryland. *See Mahai v. State*, 474 Md. 648 (2021) (holding Supreme Court of Maryland does not have jurisdiction to review Appellate Court's discretionary denial of post-conviction application for leave to appeal post-conviction proceeding pursuant to Cts. & Jud. Proc. § 12-202).

On March 16, 2022, Coleman filed the present petition for habeas relief and supplement, in which he asserts three claims for relief:

(1) Trial counsel was ineffective for failing to adequately protect his rights under the Confrontation Clause, ECF 1, at 5–7;

(2) Trial counsel was ineffective for failing to interview and secure the presence at trial of A.M. and B.T., ECF 10, at 2–4;

(3) The prosecutor engaged in misconduct by failing to disclose the whereabouts of A.M. and B.T. *Id* at 4.

Respondents filed an answer to the petition,[2] arguing that it should be denied on the merits because the state court's denial of Coleman's post-conviction petition was neither contrary to nor an unreasonable application of federal law. ECF 7, at 23–37.

## II. LEGAL STANDARDS

### A. Petitions for a Writ of Habeas Corpus

A federal petition for a writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute sets forth a highly deferential standard for evaluating state court rulings, under which state court decisions are to "be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005); *see also Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997). A federal court may not grant a writ of habeas corpus unless the state court's adjudication on the merits (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). A state court adjudication is contrary to clearly established federal law under § 2254(d) when the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law"; or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (citation omitted). "Under the 'unreasonable

---

[2] Respondent did not file a response to Coleman's supplement.

application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Williams*, 529 U.S. at 411). The state court's application of federal law must be "objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409). Furthermore, under § 2254(d)(2), "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (citation omitted). The fact that "reasonable minds reviewing the record might disagree about the finding in question" is not enough to deem a state court's factual determination unreasonable. *Id.*

### B. Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. In *Strickland v. Washington*, the Supreme Court held that to prevail on a claim of ineffective assistance of counsel, a petitioner must establish two elements: deficient performance and prejudice. 466 U.S. 668, 692 (1984). First, a petitioner must show that counsel's performance was deficient in that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Deficiency exists when "counsel's representation fell below an objective standard of reasonableness" under "prevailing professional norms." *Id.* at 688; *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003). "Judicial scrutiny of counsel's performance must be highly deferential" and

apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*.

Second, the petitioner must show prejudice in that the deficient performance by counsel consisted of errors that "were so serious as to deprive the defendant of a fair trial" with a reliable result. *Id*. at 687. To establish such prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is one "sufficient to undermine confidence in the outcome." *Id.* A petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

## III. DISCUSSION

### A. Grounds One and Two

Grounds One and Two relate to trial counsel's strategy with respect to unavailable trial witnesses, A.M. and B.T. Coleman alleges that trial counsel was ineffective for failing to interview these witnesses and secure their presence at trial, which he contends would have protected his rights under the Confrontation Clause.

Coleman asserted Grounds One and Two during his post-conviction proceedings. His trial counsel, Louis Willemin, testified at the post-conviction hearing.[3] ECF 8-6, at 40–74. Willemin testified that he was notified by letter from the prosecutor on November 10, 2015, that A.M. intended to testify at trial and Willemin needed to coordinate any contact with A.M. through the prosecutor. *Id.* at 59. Willemin testified that he attempted to interview A.M., but legal counsel for the Department of Social Services advised that A.M. did not want to speak with him. *Id.* at 60–61. On January 9, 2017, the prosecutor advised Willemin that A.M. was missing, because she was "in the car with a social worker on her way to placement…got out of the car and fled." *Id.* at 61–62. Willemin testified that the state did not oppose a continuance but noted that his trial strategy rested on the nonappearance of A.M. *Id.* at 63-64. He testified:

> It is my position that our case was better without [A.M] than it would be with [A.M.]. I had no reason to believe that [A.M.] would be helpful to us. I did have reason to believe she would be damaging to us, and, so, I felt that we were better off having a trial without [A.M.] than with her.

*Id*. Specifically, A.M. had given a damaging statement to the police, and consistent trial testimony would have been unhelpful to the defense. *Id.* at 56, 58. Willemin testified that the state did not know B.T.'s location and he also believed that B.T. would not have been helpful to Coleman's defense, either. *Id.* at 67–68.

The post-conviction court denied Coleman's ineffective assistance of counsel claims, concluding (in part):

> A.M. likely would have testified that she had been trafficked by Petitioner and engaged in prostitution at Petitioner's direction. Should A.M. have testified, she could have acknowledged the text messages exchanged with Petitioner. It would

---

[3]   Willemin's co-counsel, Ian Anthony, also testified at the hearing. ECF 8-6, at 74–85. Anthony's testimony focused on the technical cross-examination of the state's cell phone data extraction expert witness. *Id.* Anthony also confirmed that the "defense" offered at trial "was that it clearly established that we don't know who used the phone [seized from Coleman]." *Id.* at 82.

not have been helpful to Petitioner's case to have A.M. present at trial, regardless of any impeachment potential.

\*\*\*

The facts and evidence presented at the hearing do not demonstrate that trial counsel rendered ineffective assistance of counsel for failing to call A.M. as a witness. The decision not to call A.M. as a witness was a valid tactical decision. It is reasonable to believe her testimony would have been harmful to Petitioner. Accordingly, post-conviction relief on this allegation is denied.

ECF 7-1, at 204.

The Confrontation Clause provides that "the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court has interpreted the Clause as prohibiting the admission of "testimonial" statements from an unavailable declarant unless the defendant had a prior opportunity to cross-examine that declarant. *Crawford v. Washington,* 541 U.S. 36, 68 (2004) ("Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination").

However, the Confrontation Clause does not require that victims testify; rather, it bars admission of "testimonial statements of a witness who did not appear at trial." *See United States v. Biancofiori*, No. 21-3372, 2024 WL 844168, at \*3 (7th Cir. Feb. 28, 2024) (citing *Crawford*, 541 U.S. at 53–54). During Coleman's trial, the State of Maryland did not offer testimonial statements from non-testifying victims. The only statements offered, A.M.'s text messages to the defendant (ECF 8-2, at 229-236), are not "testimonial statements" and thus it was not a violation of the Confrontation Clause to admit them. *See United States v. Alvarado*, 816 F.3d 242, 251 (4th Cir. 2016) (noting that "'testimonial evidence' . . . encompasses such things as 'prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations.'") (citing *Crawford*, 541 U.S. at 68); *see also United States v. Holguin*, No. 23-50642, 2024 WL

9

4625285, at *1 (5th Cir. Oct. 30, 2024) ("[I]ncoming text message facilitating the purchase of drugs is not 'testimonial' under the Confrontation Clause because there is nothing to suggest that the primary purpose of that message was to be used in a criminal prosecution to establish or prove past events."); *United States v. Otuonye*, 995 F.3d 1191, 1206 (10th Cir. 2021) ("The text messages challenged here are not 'testimonial statements.' There is no indication that 'a reasonable person in the position of the declarant would objectively foresee' that the text messages 'might be used in the investigation or prosecution of a crime.'"); *United States v. Anderson*, No. 22-1237, 2023 WL 3413905, at *3 (6th Cir. May 12, 2023) ("The text messages are not testimonial because a reasonable person…would not have anticipated her texts being used . . . in a criminal prosecution").

The record reflects that Coleman was not deprived of an opportunity to confront his accusers because no testimonial statements by unavailable witnesses were offered against Coleman at trial.[4] Thus, any claim for ineffective assistance of counsel for failure to protect his rights under the Confrontation Clause is without merit.

Instead of a true Confrontation Clause issue, it appears that the crux of Coleman's complaint against his trial counsel is that they failed to interview and secure A.M. and B.T.'s presence at trial. Coleman speculates in his habeas petition that these witnesses would have provided testimony favorable to Coleman had they been interviewed and called to testify. Namely, Coleman believes that A.M. would have denied that the text messages on the phone were from him. ECF 10, at 3. Also, Coleman believes that both witnesses would have provided evidence to

---

[4] The statement that A.M. gave to police, mentioned during Willemin's post-conviction testimony, was not offered as evidence during Coleman's trial.

dispute the human trafficking charges because they were runaways who were already engaging in prostitution and were only asked by Coleman to provide lap dances. *Id*. at 3–4.

The decision not to call particular defense witnesses is a classic example of a strategic decision demanding the assessment and balancing of perceived benefits against perceived risks, and one to which "'[Courts] must afford . . . enormous deference.'" *United States v. Terry,* 366 F.3d 312, 317 (4th Cir. 2004) (quoting *United States v. Kozinski,* 16 F.3d 795, 813 (7th Cir. 1994)); *United States v. Chapman*, 593 F.3d 365, 369 (4th Cir. 2010) (noting that the "decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney"). In regard to a decision to call or not call a witness, "there is a presumption that 'counsel's conduct falls within the wide range of reasonable professional assistance.'" *Byram v. Ozmint,* 339 F.3d 203, 209 (4th Cir. 2003) (quoting *Strickland*, 466 U.S. at 669). "When a petitioner's ineffective assistance of counsel claim rests on trial counsel's failure to call particular witnesses, expert or otherwise, the Fourth Circuit requires "a specific proffer . . . as to what [the] witness would have testified." *Jeffries v. Bohrer*, Civ. No. PJM-22-1690, 2024 WL 4505010, at *12 (D. Md. Oct. 16, 2024) (citing *Vandross v. Stirling*, 986 F.3d 442, 452 (4th Cir. 2021)) (brackets in *Jeffries*). "A petitioner's failure to do so 'reduces any claim of prejudice *to mere speculation* and is fatal to his claim.'" *Id.* (citing *Vandross*, 986 F. 3d at 452) (emphasis in *Vandross*).

The Court is bound to defer to the post-conviction court's conclusion that trial counsel's performance was not deficient because the unavailable witnesses would have provided unfavorable testimony for the defense. Coleman offers contrary argument and theory, but no proof. *See* 28 U.S.C. § 2254(e)(1) ("a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). Moreover, even if A.M. and B.T. had testified that they were

11

runaways already engaged in prostitution when they met Coleman, the Maryland Appellate Court soundly rejected Coleman's argument on direct appeal that these facts meant he could not be found guilty on at least one of the counts of conviction. ECF 7-1, at 133–143.

Considering the deference owed to counsel's sound strategic decisions, the Court cannot say that the post-conviction court's conclusions on Grounds One and Two were contrary to or an unreasonable application of *Strickland*. In trial counsel's judgment, it was better to proceed to trial without A.M. and B.T. ECF 8-6, at 56-57. Indeed, trial counsel testified that Coleman's defense at trial was strengthened considerably by the non-appearance at trial of A.M. and B.T. *Id.* And trial counsel noted that this would be the case whether he'd interviewed A.M. or not. ECF 8-6, at 56-57 ("It is my position that our case was better without [A.M.] than it would be with [A.M.]. I had no reason to believe that [A.M.] would be helpful to us. I did have reason to believe she would be damaging to us, and, so, I felt that we were better off having a trial without [A.M.] than with her."). Coleman has thus failed to demonstrate that this decision was anything other than sound trial strategy. For these reasons, Grounds One and Two are without merit and are denied.

### B. Ground Three

In Ground Three, Coleman contends that the prosecutor engaged in misconduct by concealing A.M. and B.T.'s location from the defense. Coleman asserted Ground Three in his post-conviction petition. At the post-conviction hearing, the prosecutor, Assistant State's Attorney Colleen McGuinn, testified that on the day of Coleman's trial she had no knowledge of the whereabouts of A.M. or B.T., and thus she could not, and did not, conceal this information from the defense. ECF 8-6, at 96.

The post-conviction court rejected Coleman's prosecutorial misconduct claim:

> Petitioner cannot point to specific information or evidence that would prove that
> Ms. McGuinn had knowledge of A.M.'s whereabouts at the time of trial. Nor can

> Petitioner establish whether A.M. was in Georgia at the time of trial or after trial. Petitioner could only testify that he "felt" the State knew where A.M. was, and it seemed to him that the State was attempting to hide A.M. to prevent her testimony and A.M. from being cross-examined. This sentiment was disputed by Ms. McGuinn, who testified that she had taken no steps to hide or conceal the victims from Petitioner and that her case would have been stronger had A.M. been present. Petitioner's claims are unsupported by facts or other evidence and are insufficient to support a claim for postconviction relief.

ECF 7-1, at 206.

To prevail on a due process claim of prosecutorial misconduct, Coleman must show both misconduct and resulting prejudice. *See United States v. Caro*, 597 F.3d 608, 624 (4th Cir.2010) ("In assessing alleged prosecutorial misconduct, [this court] ask[s] whether the misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." (internal quotation marks omitted)). Coleman cannot show either misconduct or prejudice.

Coleman testified at the postconviction hearing that he believed that the prosecutor knew A.M. was in Georgia, claiming she "mysteriously" reappeared after trial. ECF 8-6, at 20. In his habeas petition, Coleman repeats the same argument but offers no evidence to support his accusation of improper conduct. ECF 10, at 4. Coleman has failed to show that the post-conviction court's conclusion of no misconduct was erroneous (*see* 28 U.S.C. §2254(e)(1)) and has also failed to show that he was prejudiced by the absence of the unavailable witnesses for the reasons discussed in Section III(A).

Ground Three is without merit and is denied.

IV. **CERTIFICATE OF APPEALABILITY**

A petitioner may not appeal the denial of a federal habeas petition without first receiving a certificate of appealability. 28 U.S.C. § 2253(c)(1). The Court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When, as here, the Court has denied the petition on the merits, a

petitioner must "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Upon a review of the record, this Court finds that Coleman has not made the requisite showing. The Court therefore declines to issue a certificate of appealability. Coleman may still request that the United States Court of Appeals for the Fourth Circuit issue such a certificate. Fed. R. App. P. 22.

## V.    CONCLUSION

For the foregoing reasons, the Petition for a Writ of Habeas Corpus is **DENIED**. The Court will decline to issue a certificate of appealability. A separate Order shall issue.


Dated: December 27, 2024                                    /s/
                                                    Brendan A. Hurson
                                                    United States District Judge